# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | : **CRIMINAL COMPLAINT** |
| v. | : |
| AUGUSTINE GUIDO,<br>  a/k/a "Augie,"<br>JAMES G. DELLARATTA,<br>  a/k/a "Jimmy Boy,"<br>JOHN TORLONE,<br>  a/k/a "Samuel,"<br>CHARLES A. GIUSTRA,<br>  a/k/a "Charlie Tuna,"<br>VINCENT J. CERCHIO,<br>RICHARD A. LAPENNA,<br>JOHN S. DICRESCENTO, and<br>ANTHONY GERBINO,<br>  a/k/a "Beansie" | : Magistrate Number: 12-7331 (CLW) |

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief.

### SEE ATTACHMENT A

I further state that I am a Special Agent, and that this complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached page and made a part hereof.

Benjamin B. Mininger
Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,
on December 17, 2012, at Newark, New Jersey

HONORABLE CATHY L. WALDOR
UNITED STATES MAGISTRATE JUDGE          Signature of Judicial Officer

ATTACHMENT A

**Count One**
**(Conspiracy to Commit Cargo Theft)**

From in or around January 2010 through on or around February 2012, in Middlesex County, in the District of New Jersey and elsewhere, defendants

AUGUSTINE GUIDO,
a/k/a "Augie,"
JAMES G. DELLARATTA,
a/k/a "Jimmy Boy,"
JOHN TORLONE,
a/k/a "Samuel,"
CHARLES A. GIUSTRA,
a/k/a "Charlie Tuna,"
VINCENT J. CERCHIO,
RICHARD A. LAPENNA,
JOHN S. DICRESCENTO,
ANTHONY GERBINO, and
a/k/a "Beansie"

knowingly and intentionally conspired and agreed with each other and others to commit an offense against the United States, namely, embezzling, stealing, unlawfully taking, carrying away, and concealing goods and chattels moving as and which were part of and which constitute an interstate shipment of freight and other property from a trailer and storage facility, station, depot, container freight, and warehouse, with the intent to convert to their use, as described in Attachment B below, contrary to Title 18, United States Code, Section 659

In furtherance of the conspiracy and to effect its unlawful objects, the above-listed defendants and their co-conspirators committed and caused to be committed the overt acts, among others, in the District of New Jersey and elsewhere, as set forth in Attachment B below.

In violation of Title 18, United States Code, Section 371.

## Count Two
## (Conspiracy to Transport Stolen Goods in Interstate Commerce-
## Stolen Television Scheme)

From in or around mid-2011, in Middlesex County, in the District of New Jersey and elsewhere, defendants

AUGUSTINE GUIDO,
a/k/a "Augie," and
JOHN TORLONE,
a/k/a "Samuel"

knowingly and intentionally conspired and agreed with each other and others to commit an offense against the United States, namely, transporting and causing to be transported in interstate commerce, stolen goods, wares, and merchandise having a value of $5,000 or more, as described in Attachment B below, knowing that the goods, wares, and merchandise had been stolen, converted, and taken by fraud, as described in Attachment B below, contrary to Title 18, United States Code, Section 2314.

In furtherance of the conspiracy and to effect its unlawful objects, the above-listed defendants and their co-conspirators committed and caused to be committed the overt acts, among others, in the District of New Jersey and elsewhere, as set forth in Attachment B below.

In violation of Title 18, United States Code, Section 371.

3

ATTACHMENT B

I, Benjamin E. Mininger, am a Special Agent with the Federal Bureau of Investigation. I have knowledge of the facts set forth herein through my personal participation in this investigation and through oral and written reports from other federal agents or other law enforcement officers. Where statements of others are set forth herein, including statements that were consensually recorded, these statements are related in substance and in part. Since this Criminal Complaint is being submitted for a limited purpose, I have not set forth every fact that I know or other law enforcement officers know concerning this investigation. I have only set forth those facts that I believe are sufficient to show probable cause exists to believe that the defendants have committed the offenses set forth in Attachment A. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

1.   At all times relevant to this Criminal Complaint:

a.   An individual was a cooperating witness for the Federal Bureau of Investigation (hereinafter "Cooperating Witness One"). As part of his cooperation over multiple years, Cooperating Witness One surreptitiously wore a recording device and consensually recorded conversations with various individuals, as set forth herein. In addition, Cooperating Witness One assisted federal agents in multiple districts by providing material information, intelligence, and evidence concerning members and associates of La Cosa Nostra and their criminal activities.

b.   Defendant AUGUSTINE GUIDO, a/k/a "Augie," (hereinafter "GUIDO") was a resident of Staten Island, New York.

c.   Defendant JAMES G. DELLARATTA, a/k/a "Jimmy Boy," (hereinafter "DELLARATTA") was a resident of Long Island, New York.

d.   Defendant JOHN TORLONE, a/k/a "Samuel," (hereinafter "TORLONE") was a resident of Long Island, New York.

e.   Defendant CHARLES A. GIUSTRA, a/k/a "Charlie Tuna," was a resident of Staten Island, New York.

f.   Defendant VINCENT J. CERCHIO (hereinafter "CERCHIO") was a resident of Staten Island, New York.

1

g.    Defendant RICHARD A. LAPENNA (hereinafter "LAPENNA") was a resident of Staten Island, New York.

h.    Defendant JOHN S. DICRESCENTO (hereinafter "DICRESCENTO") was a resident of Staten Island, New York.

i.    Defendant ANTHONY GERBINO, a/k/a "Beansie," (hereinafter "GERBINO") was a resident of North Valley Stream, New York.

j.    A co-conspirator not named as a defendant herein (hereinafter "Co-Conspirator One") was the owner of a warehouse located in northern New Jersey (hereinafter the "Warehouse").

**The Scheme to Steal Cigarettes**

2.    On or about January 27, 2010, Cooperating Witness One and defendant GUIDO attended a funeral in New York.  During this funeral, Cooperating Witness One spoke with defendant GUIDO. During this consensually recorded conversation, defendant GUIDO asked if Cooperating Witness One was aware of any warehouses that they could "rob."  Specifically, defendant GUIDO stated he was interested in stealing perfume, cigarettes, pharmaceuticals, or "even a bank."  Cooperating Witness One stated he was aware of a bank in northern New Jersey.  Defendant GUIDO then asked for the bank's address, adding that he did not care about cops, and they could "beat the joint."  Cooperating Witness One agreed to get back to defendant GUIDO.

3.    Based on the conversation described in Paragraph 2 above of this Criminal Complaint, Cooperating Witness One consented and assisted assist the Federal Bureau of Investigation in conducting an undercover operation related to the theft of a tractor-trailer loaded with counterfeit Pall Mall and Lucky 7 cigarettes (hereinafter the "Cigarettes").  Your Affiant estimates that the retail value of the Cigarettes was in excess of $1 million.  As part of this undercover operation, federal agents from the Federal Bureau of Investigation obtained approximately 270 cases of counterfeit Pall Mall and Lucky 7 cigarettes.  The Cigarettes did not bear evidence of the payment of applicable State (New Jersey) or local cigarette taxes, and they did not bear a stamp, impression, or indication as evidence of such payment of taxes, as required by New Jersey law.  The Cigarettes were placed in the back of a tractor-trailer at a locked commercial trucking and warehouse establishment in Edison, New Jersey (hereinafter the "Target Area").  As part of the undercover operation, federal agents placed video cameras and other evidence gathering equipment in and near the Target Area.

2

    4.    On or about May 7, 2010, Cooperating Witness One met defendants GUIDO and TORLONE in Edison, New Jersey.  During this consensually recorded meeting, Cooperating Witness One and defendants GUIDO and TORLONE discussed a plan to steal the Cigarettes.  The following conversation ensued, in substance and in part [AG = GUIDO; JT = TORLONE; C1 = Cooperating Witness One]:

> AG:    You got to do it when the tractor-trailer is back on the road.

> C1:    Right, I'm saying, if you come that, early in the morning before they open.

> JT:    They don't have that Lojack on it?  We have to do it right away.  Gotta unload it right away.  We got to move it.

> AG:    Or you dump it before the guy comes to pick it up.

> JT:    I say as soon as the guy comes and drops it off. . . . We go right in. . . . Sunday night, we stay here all night Sunday.  As soon as he comes, he locks up . . . . We unlock it.

> C1:    But we can't do it this week, we don't have a spot yet.

> JT:    No, no, we may have one.

> AG:    We're working on it since the day you told me . . . started working on it.

> C1:    Alright, good night.

> AG:    Before Jersey, because of all this terrorist shit, the guys had to start with this fucking thing.

> C1:    Stopping boxes and shit, yeah.

> AG:    They stop boxes and U-Haul trucks.  See the guy who jumped out of the U-Haul truck and took off on the bridge.  They closed the bridge down yesterday. . . .

* * * *

3

C1:   What are we going to do with the container?

AG:   Us?   Dump it.

C1:   Leave it in Jersey, right?   Make it look like a
      Jersey score.

AG:   Yeah, yeah.

*  *  *  *

JT:   They have distributors here like . . . on, last
      time we had Staten Island.

AG:   Nah getting rid of the cigarettes is no problem.

JT:   No, I'm saying . . . . Little ones.   Are we going
      to go in and grab it?

AG:   On the way back, stop in at the Raritan Center, I
      want to go into the complex.   Raritan Center.   Did
      you see where that news building was.   That
      complex there.   Where that hotel and that deli
      (referring to a deli located in Edison, New Jersey
      and hereinafter the "Deli") is.

C1:   [The Deli].

JT:   That little place we did good that time . . . what
      did we make?   Thirty grand?   And we had a lot of
      guys with us too.

AG:   Yeah, we had a fuckin' army.   Sometimes you need
      that many.   Fuck, over here you got to put a guy
      with a radio, you got to put a guy down there with
      a radio because they come all different ways on
      you.   They come down over here.   They come around.
      That's why I looked over here.   In the woods over
      there.   In case they happen to roll in on us when
      we're in the fucking place.   We got the
      frequencies out here?

     5.   On or about May 12, 2010, Cooperating Witness One met
defendant GUIDO in Edison, New Jersey.   During this consensually
recorded meeting, Cooperating Witness One and defendant GUIDO had
the following conversation, in substance and in part [AG = GUIDO
and C1 = Cooperating Witness One]:

4

AG:   Cigarettes is, cigarettes is gold.

C1:   Oh, forget about it.

AG:   . . . . On, on, on a, I think it's sixty cartons to the case.

C1:   There's two hundred seventy cases on the container, two seventy.

AG:   Two seventy times . . . .

C1:   Fif, fifty . . . cartons.  Fifty. . . .

AG:   Sixty-eight cases.

C1:   Fifty.

AG:   Fifty-eight cases, times what?

C1:   Two hundred seventy cases.

AG:   You wanna say forty dollars across the board . . . . How much is that?

[Your Affiant believes the reference to $40 is the amount of money defendant GUIDO believed he and his co-conspirators could obtain by selling each unit of the Cigarettes].

C1:   (UI) fuckin'.

AG:   It's more than a million dollars.

C1:   Million dollars, sure.  Big money, yeah, yeah, I know.

AG:   What we used to do . . .

                        * * * *

AG:   How many, how many cartons you said was on there?

C1:   Two seventy, oh.

AG:   Two seven . . . .

5

C1:   Fifty, fifty cartons (UI) case, two hundred
      seventy cases.

AG:   How many, how, how, how many, how many cartons on
      a, on a skid? . . . .You said two hundred seventy
      cases?

C1:   Oh, I don't know, two hundred seventy cases, yeah.

AG:   That's eh, two hundred seventy, you, you hand load
      them, that's five and change, that's what we used
      to do . . .

C1:   Yeah, yeah.

                        *  *  *  *

C1:   Alright, so you got time now, you got a few weeks
      for you to get a spot and we'll take it out, take
      (UI).

AG:   Yeah, hopefully by then we'll get a spot, if not
      we'll, we'll load it in the fuckin' van.

C1:   That's all.  Don't worry we got enough time.

AG:   I'll figure it out, I'll put a, I'll put a fuckin'
      van load of shit in my fuckin' garage whatever.

C1:   We got, got, we go four o'clock we got a couple of
      hours unloading.

AG:   Oh yeah, four, four o'clock in the morning you
      mean?

C1:   Yeah, we go four o'clock.

AG:   Yeah, (UI) you got vans you can go in. . . .

C1:   Anytime you want.

AG:   You can go there as soon, as soon as it gets dark,
      ten, ten eleven o'clock, boom, you roll in there.

C1:   At night, as long as the joint's closed.

AG:   We, we, we put up, the guy's watching the road.

C1:    No because, see 'cause Sunday there's nobody
       working, which is good, so eh, I don't know what
       time. . . .

AG:    Yeah, all you, all you gotta worry about over
       there. . . .

C1:    I don't know what time they get outta there on a
       Saturday.

AG:    All you gotta worry about over there, you gotta
       worry about it. . . . is, is the security.

C1:    Right, everybody's around.

AG:    Yeah. . . . And then cut the lock and then cut a
       hole in the fence in case anybody comes in on us
       they won't see a hole in the fence. . . . little
       dolly with us we'll just roll the fuckin'.

C1:    That's all.

    6.    On or about June 2, 2010, Cooperating Witness One met
defendants GUIDO and TORLONE in Edison, New Jersey at the Deli.
Thereafter, they traveled to the Target Area, the location of the
planned theft of the Cigarettes, to reconnoiter and plan the
theft.  During this consensually recorded meeting, the following
conversation ensured, in substance and in part [AG = GUIDO; JT =
TORLONE; and C1 = Cooperating Witness One]:

C1:    How we going to do this, how we gonna do, are we
       gonna just come with a truck?  What do you wanna
       do?

AG:    Come with a truck.  We got to back the guy up.  If
       this is the main road, gotta keep a guy over here
       . . . a guy in the bush.  Nobody sitting in the
       car.  Have one guy park some place to pick up the
       drop guys.  Whoever is going to hook up will come
       in.  One guy over here with a radio.  Put the guy
       to cut the fence, to let him in.  He'll back it
       in.  We'll cut the fence in the back.

JT:    Don't gotta back it in, just pull in.

C1:    He can pull in and make a u-turn.

AG:    He's got to back it in.  Guide him in.

7

* * * *

AG: If we don't get a tractor, we will come with 20 footers and just park and just take the load right out of the fucking trailer.  If we get the tractor, hook up the fucking box.

C1: Alright.

JT: [Cooperating Witness One] come here Sunday afternoon.

C1: What?

JT: Come here Sunday afternoon and see what it is.

C1: Yeah.  I will.  I'll be here.  I'll come and kill some time here.

AG: I'd rather come with a tractor, hook it up, and run.

C1: Right on, right up.  Best way to go.

JT: This is what we take to go back.

* * * *

AG: You telling anybody?

JT: Who me?

C1: Don't say nothing.

AG: I'm saying.

C1: Going to tell Jimmy Boy [defendant DELLARATTA]. We [are] suppose to tell him.

AG: Tell him.

C1: That's all, yeah.  I'll tell him we're doing something.

AG: I already told him we're doing something, but I did not tell him where.  He [defendant DELLARATTA] don't want to know how, where.

8

C1:   Yeah, yeah.  That's all.  We left it like that.

AG:   If we get lucky, we'll throw him a few dollars.

C1:   That's it, no problem.

7.   On or about June 9, 2010, Cooperating Witness One met defendants GUIDO, TORLONE, and GERBINO.  During this consensually recorded meeting, defendant TORLONE stated that they could use a "plumber's tool" to snap the lock off the gate surrounding the area where the Cigarettes would be stored inside the tractor-trailer.  Later during the conversation, they discussed that the Cigarettes would be on pallets, and that there were a couple hundred cases.  Defendant GUIDO stated that they were talking about a million dollars, or words to that effect.  Later during the conversation, Cooperating Witness One stated that they would need approximately six individuals to unload the Cigarettes from the tractor-trailer.  Thereafter, Cooperating Witness One and defendants GUIDO, GERBINO, and TORLONE drove to the location to reconnoiter the area where they planned the theft.  Defendant GUIDO noted that the lock was a "piece of shit," or words to that effect.  Later during the conversation, defendant GUIDO advised that they needed ski masks and baseball caps.  During this meeting, defendant GUIDO stated that on the day planned for the operation that they would meet at a location in Edison, New Jersey.

8.   On or about Saturday, July 31, 2010, defendant GUIDO, TORLONE, GIUSTRA, and Cooperating Witness One (acting at the direction of the Federal Bureau of Investigation), and others stole a trailer (hereinafter the "Trailer"), containing the Cigarettes, from the Target Area.  The Trailer was leased to the United States government.  Cooperating Witness One was wearing a recording device.  In addition, portions of the undercover operation were surveilled and videotaped by law enforcement.  Based on Your Affiant's review of this undercover operation, including video surveillance, law enforcement surveillance, my discussions with other agents, and other sources of evidence, I am aware of the following events that occurred on or about July 31, 2010:

a.   At approximately 1:20 p.m., law enforcement officers observed GIUSTRA drive a green tractor, with the letters "GTFM Trans NY/NJ"" affixed to driver's side door (hereinafter the "Green Tractor"), into the Deli parking lot located in Middlesex County, New Jersey.  The Deli is approximately 3.5 miles from the Target Area.  Defendant GIUSTRA was observed wearing an orange reflective vest and a tattoo on his right calf.

b.     At approximately 1:45 p.m., law enforcement officers observed Cooperating Witness One, LAPENNA, GIUSTRA in the Deli's parking lot where they entered a black Nissan truck (hereinafter the "Black Truck").  LAPENNA was observed driving the Black Truck, Cooperating Witness One was observed in the passenger seat, and GIUSTRA was observed in the back seat of the Black Truck.

c.     At approximately 1:52 p.m., law enforcement officers video recorded the Target Area.  At this time, the gate leading to the Target Area was locked and closed, and the Trailer, which was secured with a lock, was located approximately 50 feet behind the secured gate.  This gate was designed to prevent vehicles from entering the Target Area when secured; however, the Target Area was not completely surrounded by a fence, thus allowing individuals to enter the Target Area on foot.

d.     At approximately 1:52 p.m., law enforcement officers video recorded the Black Truck, containing Cooperating Witness One, LAPENNA, GIUSTRA, drive, briefly park just outside the Target Area near the secured gate, and then depart.

e.     At approximately 2:01 p.m., law enforcement officers observed Cooperating Witness One, LAPENNA, GIUSTRA return in the Black Truck and park in the Deli's parking lot.

f.     At approximately 2:12 p.m., law enforcement officers observed GUIDO enter the Deli's parking lot in a red Dodge Truck (hereinafter the "Red Truck"), and CERCHIO and DICRESCENTO were observed inside the Red Truck.  After arriving at the Deli, GUIDO, CERCHIO, and DICRESCENTO were observed walking toward the Black Truck.  At approximately 2:16 p.m., DICRESCENTO was observed removing bolt cutters with red handles from the Red Truck and placing them in the Black Truck. DICRESCENTO was observed walking with a distinct limp.

g.     At approximately 2:16 p.m., law enforcement officers observed defendant GIUSTRA, with defendant TORLONE as a passenger, driving the Green Tractor and departing the Deli's parking lot.

h.     At approximately 2:24 p.m., law enforcement officers observed defendant GUIDO driving the Red Truck up to the secured gate leading into the Target Area, apparently looked at the gate, and then drove away.  Defendants CERCHIO and DICRESCENTO, at the time, were passengers in Red Truck.  This event was video-recorded.

i.   At approximately 2:25 p.m., law enforcement officers observed defendants CERCHIO and DICRESCENTO, who were both wearing masks covering their faces, walking toward the gate leading to the Target Area.  Defendant CERCHIO had a pair of bolt cutters in his possession.  Thereafter, defendant CERCHIO and DICRESCENTO were observed entering the Target Area on foot. These events were video-recorded.

j.   At approximately 2:26 p.m., law enforcement officers observed defendants CERCHIO and DICRESCENTO approach the Trailer.  At approximately the same time, a video recording device, placed near the Trailer, video-recorded defendant CERCHIO use the bolt cutters to cut the lock securing the Trailer. Thereafter, defendant CERCHIO and DICRESCENTO were video-recorded.

k.   At approximately 2:28 p.m., law enforcement officers observed defendants CERCHIO and DICRESCENTO walk away from the trailer and toward the gate leading to the Target Area. Thereafter, defendant CERCHIO was observed using the bolt cutters to cut the lock securing the gate leading into the Target Area and opened the gate.  Immediately thereafter, defendant GUIDO, in the Red Truck, drove into a park lot adjacent to the Target Area's gate.  Defendant GUIDO was observed talking on a hand-held radio (i.e., a "walkie-talkie").  The Green Tractor then entered the Target Area, driven by defendant GIUSTRA.  These events were video-recorded.

l.   At approximately 2:30 p.m., defendant GUIDO, driving the Red Truck, departed the parking lot adjacent to the Target Area.  Thereafter, defendant GIUSTRA, driving the Green Tractor, positioned the tractor near the Trailer.  Defendant TORLONE was located in the passenger seat.  The Green Tractor's license plate was concealed.  Defendants GIUSTRA and TORLONE, who were both wearing masks covering their faces, then exited the Green Tractor and connected the Trailer to the Green Tractor These events were video-recorded.

m.   At approximately 2:31 p.m., law enforcement officers observed defendant CERCHIO walking toward the gate leading to the Target Area with bolt cutters in his possession, and defendant GUIDO was observed inside the Red Truck in the parking lot adjacent to Target Area.  These events were video-recorded.  Thereafter, a law enforcement officer heard defendant GUIDO instruct defendant CERCHIO to enter the Red Truck. Approximately one minute later, a law enforcement officer observed defendant GUIDO speaking into the hand-held radio.  At approximately 2:33 p.m., a law enforcement officer observed

11

defendant DICRESCENTO, who was inside the Target Area and near
the Trailer, running toward the gate leading into the Target
Area.  After arriving at the gate, a law enforcement officer
observed defendant DICRESCENTO with a hand-held radio in his
possession and next to his ear.  Defendant DICRESCENTO then
walked back to the Trailer.  This event was video-recorded.

       n    At approximately 2:40 p.m., law enforcement
officers observed defendants CERCHIO and DICRESCENTO enter the
Red Truck, located in the parking lot adjacent to the Target Area
driven by defendant GUIDO, and remove their masks.  This event
was video-recorded.

       o.   Minutes later, law enforcement officers observed
defendant GUIDO, with defendants CERCHIO and DICRESCENTO as
passengers, depart the parking lot adjacent to the Target Area.
The Green Tractor, connected to and hauling the Trailer, was
observed following the Red Truck.  The Green Tractor was driven
by defendant GIUSTRA, and defendant TORLONE rode in the Green
Tractor as a passenger.

       p.   At approximately 3:44 p.m., law enforcement
officers observed the Green Tractor, without the Trailer, in the
Deli's parking lot.  The Trailer, with its contents removed, was
recovered in Middlesex County, New Jersey.

       q.   At approximately 3:03, law enforcement officers
observed the Tractor, connected to the Trailer, arrive at the
Warehouse located in Perth Amboy, New Jersey.  At approximately
3:08 p.m., the gate to the Warehouse was closed.  At
approximately 3:31 p.m., law enforcement officers observed the
Green Tractor, without the attached Trailer, depart the
Warehouse.  The Trailer remained behind, near the Warehouse.

       r.   At approximately 3:48 p.m., law enforcement
officers observed defendants GUIDO, CERCHIO, and DICRESCENTO, all
in the Red Truck, enter the Deli's parking lot.  At approximately
4:12 p.m., defendant GIUSTRA, in the Green Tractor, departed the
Deli's parking lot.

     9.   On or about July 31, 2010, the following items were
stolen from the Target Area: (1) the Trailer; and (2)
approximately 270 cases of counterfeit Pall Mall and Lucky 7
cigarettes.  The Trailer contained a Global Positioning Satellite
device (hereinafter "GPS").  According to data from the GPS
device, the following events occurred on or about July 31, 2010
related to the location of the Trailer, in substance and in part:

      a.   At approximately 9:46 a.m., law enforcement officers placed the Trailer, containing the Cigarettes, inside the Target Area.

      b.   Beginning at approximately 2:42 p.m., the Trailer was moved from the Target Area.

      c.   At approximately 3:06 p.m., the Trailer was located near the Warehouse.

      d.   At approximately 3:36 p.m., the Trailer departed the area near the Warehouse.

10.   According to data from the GPS device, on or about August 1, 2010, the Trailer was moved to a location in Woodbridge, New Jersey.  On or about August 2, 2010, law enforcement officers reclaimed the Trailer that had been abandoned at a location near Woodbridge, New Jersey.  The Trailer was founded emptied of its contents, namely, the Cigarettes.

11.   On or about March 15, 2011, the Undercover Officer met Co-Conspirator One at the Warehouse.  During this consensually recorded meeting, the Undercover Officer, at the direction of Co-Conspirator One, handed approximately $5,000 in cash to a third party as payment for the Cigarettes.  These bills were provided by the Federal Bureau of Investigation, and each bill's serial number was recorded.  After the Undercover Officer departed the Warehouse with approximately 1,000 cartons of Cigarettes, the Cigarettes were placed into evidence by the Federal Bureau of Investigation.

12.   Later that day, on or about March 15, 2011, Cooperating Witness One met with Co-Conspirator One at the Warehouse.  During this consensually recorded meeting, the following conversation occurred, in substance and in part [C1 = Cooperating Witness One and CC = Co-Conspirator One]:

      C1:   He buddy, how are you?

      CC:   Ok. Yeah.

      C1:   Uhh, you got that?  Right?  $5,000?

      CC:   It's inside.  What are you doing?

      C1:   Oh. . . . Well, here's how, since we got eight guys involved, with you.  You know, steer guy [a purported individual who gave Cooperating Witness

One the "tip" related to the Cigarettes; however, this "tipster" did not exist and was information used as part of this undercover sting], seven guys. So, you got $600. I gotta give, we're all gonna take $600 a piece. That's how it comes down to. . . . I gotta give Vinny [defendant CERCHIO], what did Vinny give his case? 2-300? Charlie [defendant GIUSTRA] took a case. We're breaking it all down, so I gotta give them, so, it'll all break down to 600 a piece. You take, we're gonna take all $600 now. The rest of the stuff, as we go, we all take an end.

CC:   Ok.

Later during the conversation, Cooperating Witness One stated, "You got $600 already," and Co-Conspirator One replied, "OK, but I gotta try to get some more than fucking $600, $600 ain't fucking cutting it, ya know what I'm saying?." Later, the following conversation ensued, in substance and in part:

CC:   So, what am I taking out of this here? Just $600 for myself?

C1:   No, you took six already. We're all getting six [hundred dollars] out of this.

CC:   When am I getting 6?

C1:   How . . . cases you sold the guy? You made $600 for them.

CC:   OK, so I don't get nothing outta this?

C1:   Not now, everybody is broke. Next one we get, we'll do it.

CC:   I gotta get something out of this. . . . I'm waiting a year and didn't get nothing.

C1:   I know. The next one you get.

CC:   Come one, I'm supposed to get 25. I'm supposed to get 25, but I settle for 15. But I didn't get nothing.

C1:   But the next one you get, you take it. . . .

14

CC:   Alright.

13.   On or about March 15, 2011, Cooperating Witness One met defendant GUIDO in Staten Island, New York.   During this consensually recorded meeting, Cooperating Witness One and defendant GUIDO discussed sharing the money derived from the sale of the Cigarettes, as described above.   During this conversation, they agreed to divide and distribute the proceeds as follows: approximately $740 for defendant GUIDO; approximately $700 for defendant TORLONE; approximately $700 for DICRESCENTO; approximately $400 for defendant CERCHIO; approximately $400 for GIUSTRA; approximately $700 for LAPENNA; and approximately $1,360 for Cooperating Witness One (including approximately $600 for the purported individual who gave Cooperating Witness One the "tip" related to the Cigarettes; however, this "tipster" did not exist and was information used as part of this undercover sting). Thereafter, Cooperating Witness One turned over approximately $1,360 in cash to a law enforcement officer, which cash was then retained as evidence.   The serial numbers on these bills ($1,360) corresponds to the serial numbers on the bills provided by the Undercover Officer to Co-Conspirator One on or about March 15, 2011, as described above.

14.   On or about March 30, 2011, Cooperating Witness One met defendant DELLARATTA in New York.   During this consensually recorded meeting, the following conversation ensured, in substance and in part [C1 = Cooperating Witness One and JD = DELLARATTA]:

C1:   Listen, this is for you.   It ain't much, its 500. This we got from the, sold the cigarettes.

JD:   From who?   Oh, okay.

C1:   So, I said, it's a nickel for you out of the, from the cigarette money.   As we sell them, ya know. You keep that.   We ain't moving'em yet, we're trying.   I got, I got Augie's nephew hustling them, this and that.   I got, I, I got the guy to buy them [the Cigarettes], some guy in Newark, bought'em.

JD:   I can't. . . .

C1:   I got another guy that might want three cases [of Cigarettes].   I can't sell them.   I got to see him tonight.

15

JD:  If I was smoking, I would smoke them. . . . Nah,
     nah, I couldn't smoke them.

C1:  They're shit.

JD:  I'm used to non-filtered.  If I smoked 'em . . . .
     [T]hey ain't bad.  I got them at the club. . . . I
     got the pack from Augie.

C1:  Oh [laughing].

15.  On or about February 26, 2012, law enforcement officers
executed a search warrant at the Warehouse and recovered
approximately 52 full boxes with each box containing
approximately 50 carton of the Cigarettes.  These are the same
Cigarettes as described in Paragraph 2 above.  These Cigarettes
were retained as evidence.

**The Stolen Television Scheme**

16.  In or around late May 2011, the Federal Bureau of
Investigation purchased approximately 25 32 inch Toshiba
flatscreen televisions, costing approximately $8,797 in total.
These televisions were represented to the defendants described
herein as stolen (hereinafter the "Stolen Televisions") by an
individual acting at the direction of the Federal Bureau of
Investigation namely, Cooperating Witness One. See 18 U.S.C. §
21.

17.  On or about June 3, 2011, at the Warehouse, Cooperating
Witness One met with defendants GUIDO, TORLONE, and Co-
Conspirator One.  During this consensually recorded meeting, the
following conversation occurred, in substance and in part [C1 =
Cooperating Witness One; AG = GUIDO; JT = TORLONE; and CC = Co-
Conspirator One]:

C1:  I got 25 of 'em.

JT:  25 televisions?

C1:  So, are you takin' it, twenty-five TVs.  He's
     gonna try and get, in a couple of weeks. . . nail
     another 25 [televisions] like that.  See cause, if
     I try to get them all at once.

JT:  How big are they?

C1:  He fucks with paper.  Thirty-two inches.

16

JT:   Thirty-two inches?

C1:   Yeah, come on, see. . . .

                    * * * *

C1:   Move these out of the way.

C1:   Yeah.

C1:   Nobody'll be around over here.   Okay.

C1:   That's them, right?

C1:   Yeah.

AG:   I saw. . . .

JT:   Toshiba.   Toshiba.   Toshiba.

C1:   Here, cut the shell.   I wanna break it. . . .

AG:   I don't got my knife with me.

C1:   Yeah.   Don't worry about it.

C1:   Yeah.

C1:   . . . . Break it, whatever you gotta do.

C1:   Alright [sound of ripping open a create and/or
      plastic].

                    * * * *

AG:   [Stating how much they could obtain for each
      television] Two, two-fifty, right?

JT:   Take one, HD.   HD.   HD.

C1:   Okay.

JT:   How many you get?   20?

C1:   25.   Well . . . . [Co-Conspirator One], you wanna
      take one home?

C1:   Yeah.   I'll take one.

                         17

C1:   Yeah. . . . Now, the cigarettes we're gonna start takin' outta here a little bit at a time and we're gonna fuckin' dump them.

C1:   What do you mean?

C1:   We'll take a little at a time [of the Cigarettes].

\* \* \* \*

During this conversation, Cooperating Witness One explained how the televisions had been stolen, specifically, that an individual where the televisions were kept fabricated the paperwork to conceal the theft:

C1:   The guy comes with a truck . . ., and they fuck around with the paperwork and drop off at the same, twenty to him but he takes 40?  You know?  And I take.

AG:   Gotta make that guy grab the driver.  Do whatchu gotta do.

Later during the conversation, defendant TORLONE contacted another individual to arrange the pick up of the Stolen Televisions.  Defendant TORLONE reported that Co-Conspirator One would pick up the Stolen Televisions from the Warehouse the following day.  They then discussed the sale price of the Stolen Televisions:

JT:   There's 24 of 'em.   150 a piece.

C1:   That's 4,000.

JT:   That's uh, every ten is . . . 1,500. . . . So it's, it's 3,000 and for more? . . . . $3600.

CC:   $3600.

C1:   $3600, you get?

CC:   Yeah.

C1:   Twenty-four times 150, right?

CC:   Yeah.

AG:   Yeah.

\* \* \* \*

18

CC:   I'll let'em put it on two separate, two separate
      pallets . . . and we . . . it boom, boom, I'll
      shoot'em right in the truck.

During the meeting, defendant TORLONE spoke with another unknown
individual over the phone, and the individual agreed to send
another person (hereinafter the "Individual") to pick up the
Stolen Televisions from the Warehouse.

     18.   On or about June 6, 2011, law enforcement officers,
near the Warehouse, observed the Individual arrive at the
Warehouse driving a large van with New York license plates.
Thereafter, law enforcement officers observed Co-Conspirator One
loading the Stolen Televisions into the Individual's van.  After
the Stolen Televisions were loaded into the van, law enforcement
officers followed the van, driven by the Individual, from the
Warehouse located in New Jersey into Staten Island, New York.